IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALINA CRISAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 C 15252 |
| | ) | |
| Samuel OLSON, Kristi NOEM, *et al.* | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

This matter comes before the Court on the petitioner's motion for temporary restraining order. Petitioner has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 [ECF No. 1] and an emergency motion for a temporary restraining order ("TRO") [ECF No. 2] seeking release from immigration detention pending the Court's review of the habeas petition. After reviewing the motion, all supporting materials, and the parties' oral argument and testimony at court hearings on December 17 and 18, 2025, the Court granted the motion for temporary restraining order and issued an order requiring Petitioner's release from custody. The Statement below sets forth the Court's reasoning and the provisions of the TRO.

## STATEMENT

### I.   Background

Petitioner Alina Crisan is a 45-year-old Romanian citizen who has lived in the United States continuously since 2007. ECF No. 1 ¶ 34. Her family—including her U.S. citizen parents, her three U.S. citizen children, her husband and her siblings—reside in the United States. ECF No. 2 at 2. Ms. Crisan has never been convicted of any crime. *Id.*

Ms. Crisan was ordered removed to Romania on January 14, 2011. ECF No. 1 ¶ 35. Although she has remained subject to that final order of removal for almost fifteen years, immigration authorities have repeatedly permitted her to remain in the United States. ECF No. 2 at 2. In 2019, Immigration and Customs Enforcement ("ICE") placed Ms. Crisan on an Order of Supervision ("OSUP"), authorizing her to live at liberty subject to specific conditions, including periodic check-ins with ICE. *Id.* From 2019 through 2025, Ms. Crisan consistently complied with all conditions of her supervision. *Id.*

On November 10, 2025, Ms. Crisan appeared with counsel for a routine ICE check-in at the Chicago Field Office. *Id.* She was released on an ankle monitor. *Id.*

On December 16, 2025, without prior notice, Respondents took Ms. Crisan into custody and transported her to the Broadview Processing Center in Broadview, Illinois. *Id.* Ms. Crisan was then transferred twice—first to the Clay County Jail in Brazil, Indiana, and then to the Clark

County Jail in Jeffersonville, Indiana. ECF No. 12. Respondents did not give Ms. Crisan an explanation as to why her OSUP was being terminated. ECF No. 2 at 2-3.

After Ms. Crisan was arrested by ICE, she was taken to the Bridgeview processing center where she remained for several hours before being transported, in leg shackles and handcuffs, to the Clay County Jail in Brazil, Indiana. The next day she was transferred to the Clark County jail, also located in Indiana. There, according to unrebutted allegations in the habeas petition, the motion for TRO and testimony presented to the Court by the petitioner, Ms. Crisan has been confined in severely overcrowded conditions. *See* ECF No. 1 ¶ 52-56; ECF No. 2 at 5-8; Crisan TRO testimony (Dec. 18, 2025). She has been required to sleep on a concrete floor, without a mattress or cot, in a crowded cell where a single toilet is shared by a large number of detainees. *Id*. A surveillance camera is installed above the toilet. *Id*. The only source of drinking water is the bathroom sink. *Id*.

On December 17, 2025, the Court held its first hearing on the TRO motion. ECF No. 7. During that hearing, the Court asked the Respondent to produce documentation authorizing the revocation of Ms. Crisan's OSUP and subsequent detention. TRO Tr. (Dec. 17, 2025) at 14 ¶ 10-19.

At the Court's second hearing on the TRO Motion [ECF No. 11], on December 18, 2025, respondents produced a written Notice of Revocation of Order of Supervision, signed by Acting Chicago Field Office Director Erik S. Weiss on December 16, 2025. The notice states that Ms. Crisan's OSUP has been revoked because of undefined "changed circumstances" in her case, that she will be detained by ICE, and that she will be "expeditiously removed" from the United States pursuant to the outstanding order of removal against her.

The notice provides that under 8 C.F.R. § 241.4, Ms. Crisan will "promptly be afforded an informal interview" and an opportunity to respond to the revocation decision, including a chance to "submit any evidence or information" in support of her release. It further states that if she is not released following this informal interview, she will receive "notification of a new review, which will occur within approximately three months of the date of this notice."

As of the Court's order releasing her from custody, ICE had not given Ms. Crisan an interview, nor provided her with an opportunity to respond or to submit evidence in support of her release. TRO Tr. (Dec. 18, 2025). As of December 18, 2025, Ms. Crisan remained detained at the Clark County Jail in Jeffersonville, Indiana. ECF No. 7.

The petitioner's motion for TRO seeks Ms. Crisan's immediate release from detention pending adjudication of her contemporaneously filed habeas petition. ECF No. 2 at 1.

## II.   Jurisdiction

The Court's authority to hear petitioner's habeas challenge—and this related motion for temporary restraining order—is clearly established.

Petitioner brings this action pursuant to 28 U.S.C. § 2241, challenging the lawfulness of her present detention following the revocation of an Order of Supervision. She does not challenge the validity of the underlying removal order or seek to enjoin its execution.

2

District courts retain jurisdiction under § 2241 to review the legality of immigration detention, including detention occurring after a final order of removal has issued. *Zadvydas v. Davis,* 533 U.S. 678, 680 (2001) ("The basic federal habeas statute grants the federal courts authority to determine whether post-removal-period detention is pursuant to statutory authority."). Thus, the existence of a final order of removal does not divest this Court of the authority to consider whether a noncitizen's continued detention complies with governing statutes, regulations, and constitutional requirements.

Respondents contend that jurisdiction is barred by both 8 U.S.C. § 1252(g) and 8 U.S.C. § 1252(a)(2)(B)(ii). The Court disagrees and takes each jurisdictional argument in turn.

### A.     8 U.S.C. § 1252(g) Does Not Bar the Court's Jurisdiction

Respondents contend that jurisdiction is barred by 8 U.S.C. § 1252(g), which strips jurisdiction from federal courts over claims "arising from" three types of immigration decisions made by the Attorney General: the decisions to (1) "commence proceedings," (2) "adjudicate cases," and (3) "execute removal orders." Respondents invoke the third category—execution of a removal order—and argue that petitioner's detention is itself part of that execution. According to respondents, because the petitioner is already subject to a final order of removal and ICE is detaining her while arrangements for removal are made, her challenge to detention "arises from" execution of a removal order and is therefore outside this Court's jurisdiction.

The Court disagrees. Supreme Court precedent makes clear that § 1252(g) does not divest district courts of jurisdiction over all claims that bear some relationship to removal orders. Rather, the "arising from" language of § 1252(g) requires a "narrow reading" and applies only to challenges that directly target the three discrete actions enumerated in the statute. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, (1999) ("It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings"). As the Supreme Court clearly explained in *Jennings v. Rodriguez,* § 1252(g) does not "sweep in any claim that can technically be said to 'arise from' the three actions of the Attorney General…we read the language to refer to just those three specific actions themselves." 583 U.S. 281, 294 (2018).

That distinction controls here. Petitioner does not challenge the government's authority to remove her, nor does she seek to delay, enjoin or otherwise interfere with the execution of the removal order. Instead, she challenges her present detention following the revocation of an Order of Supervision, including whether respondents lawfully revoked that supervision and may detain her without providing the process required by the regulation. Were the respondents correct that 1252(g) divests federal courts of jurisdiction to consider post-removal detention decisions, *Zadvydas*—which addressed the subject of post-removal order jurisdiction—could not have been decided as it was.

Detention following revocation of an Order of Supervision is not itself the execution of a removal order. It is a separate custodial and regulatory framework. Challenges to detention—even where removal is contemplated—do not "arise from" the execution of a removal order within the meaning of 1252(g). *Jennings*, 583 U.S. at 294.

3

    **B.    8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Deprive the Court of Jurisdiction**

Respondents also contend that jurisdiction is barred by 8 U.S.C. § 1252(a)(2)(B)(ii), which limits judicial review of certain discretionary decisions specified by statute. Respondents argue that because revocation of an Order of Supervision is a discretionary decision, this Court lacks jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii). That argument misreads the statute and the Supreme Court's interpretation of it.

In *Kucana v. Holder*, the Supreme Court considered whether § 1252(a)(2)(B)(ii) bars judicial review of a decision at the core of the removal process: the denial of a motion to reopen removal proceedings. 558 U.S. 233, 242 (2010). The Court held that § 1252(a)(2)(B)(ii) does not bar judicial review of such a decision. *Id.* at 253.

In reaching that conclusion, the Court made two points that are particularly instructive here. First, § 1252(a)(2)(B)(ii) strips jurisdiction only over decisions that Congress itself has specified by statute to be within the Attorney General's discretion—not decisions labeled discretionary by regulations the agency promulgates for itself. *Id.* at 248 ("Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute…If Congress wanted the jurisdictional bar to encompass decisions specified as discretionary by regulation along with those made discretionary by statute, moreover, Congress could easily have said so").

Second, § 1252(a)(2)(B)(ii) does not stand alone. *Id.* at 247. It functions as a limited "catchall" whose scope is limited to the types of discretionary decisions listed in § 1252(a)(2)(B)(i). *Id.* at 247 (stating that the clauses should be "read harmoniously"). The discretionary decisions listed in § 1252(a)(2)(B)(i) are "substantive decisions…made by the Executive in the immigration context as a matter of grace"—decisions that "involve whether aliens can stay or not." *Id.* at 247-48. They include "waivers of inadmissibility based on certain criminal offenses, § 1182(h), or based on fraud or misrepresentation, § 1182(i); cancellation of removal, § 1229b; permission for voluntary departure, § 1229c; and adjustment of status, § 1255." *Id.* at 248.

The petitioner does not seek the type of relief listed under 1252(a)(2)(B)(i). She does not challenge the validity of her removal, ask the Court reconsider it, or seek permission to remain in the country. She challenges only the lawfulness of her detention following a warrantless arrest without notice or hearing prior to the revocation of an Order of Supervision.

That distinction is key. If § 1252(a)(2)(B)(ii) does not bar judicial review of a decision as central to removal as the refusal to reopen a removal case, it cannot plausibly bar review of a far more collateral question—whether the government lawfully detained a noncitizen after revoking supervision. Detention following revocation of an Order of Supervision is not a substantive immigration benefit involving executive grace; it bears no resemblance to the decisions listed in § 1252(a)(2)(B)(i). Indeed, the petitioner did not need to be detained at all for the government to effectuate her removal.

4

**III.     Analysis**

      **A.     Legal Standard**

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 22 (2008). The purpose of a TRO is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1101 (7th Cir. 2008) ("By maintaining the status quo, we ensure that the final resolution of this case on the merits will be just that—final.").

TROs are governed by the same standard applicable to preliminary injunctions. *USA-Halal Chamber of Com., Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427 n. 5 (N.D. Ill. 2019); *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001); *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082 (C.D. Ill. 2001).

To obtain a TRO, the movant must show that she is (1) likely to succeed on the merits, (2) likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020).

A TRO is "never awarded as of right," and the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of requested relief." *Winter*, 555 U.S. at 22. And importantly, the Seventh Circuit applies a "sliding scale" approach in consider the factors outlined in *Winter*. A stronger showing of one element may offset a weaker showing of another. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. So "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984); *see also Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)*; Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

      **B.     Petitioner is Likely to Succeed on Her Claim of an *Accardi* Violation**

To satisfy the likelihood-of-success requirement, a movant must make a "strong showing" that she is likely to succeed on the merits. *Pritzker,* 973 F.3d at 762-63. The movant need not show that she will "definitely win the case," nor must she establish her case by a preponderance of evidence. *Id.* But she must show more than a "mere possibility" or show a likelihood of success that is "better than negligible." *Id.* A strong showing "normally includes a demonstration of how the applicant proposes to prove the elements of her claim." *Id.*

The petitioner contends that her detention is unlawful because respondents failed to comply with their own regulations governing the revocation of an Order of Supervision, in violation of the principles set forth in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954) (holding federal agencies are required to follow their own regulations). *See* ECF No. 1 ¶ 93-97. Because success on this claim would independently support the relief sought—release from detention—the Court need not address petitioner's remaining theories at this stage.

5

### *1.  Regulatory Framework Governing Orders of Supervision*

The government may detain noncitizens subject to final orders of removal during the "removal period," defined as the ninety days following the date a removal order becomes administratively final. 8 U.S.C. § 1231(a)(1). If a noncitizen is not removed during that period, the statute authorizes release under an Order of Supervision ("OSUP"). 8 U.S.C. § 1231(a)(3). An Order of Supervision permits release subject to conditions, such as periodic reporting to immigration authorities. *Id.*

Once a noncitizen is released under an Order of Supervision, she is "subject to supervision under regulations prescribed by the Attorney General." *Id.* Those regulations are set forth in 8 C.F.R. § 241.4, which governs continued custody, release, and re-detention of noncitizens beyond the removal period. Section 241.4 authorizes the government to revoke an OSUP for a variety of reasons, including 1) the purposes of release have been served, 2) the noncitizen violates any condition of release, 3) the enforcement of a removal order or commencement of removal proceedings, or 4) a noncitizen's inappropriate conduct warrants revocation. § 241.4(I)(2)(i-iv).

Section 241.4(i) does not merely explain why an OSUP may be revoked; it also prescribes how revocation must occur. The regulation outlines a specific process: a noncitizen whose supervision is revoked must be notified of the reasons for revocation, promptly afforded an informal interview after being taken into custody, given an opportunity to respond, and—if not released—provided a subsequent custody review within approximately three months. §241.4(I)(1, 3).

Thus, § 241.4 affords the government substantial discretion to decide *whether* to revoke an Order of Supervision and *why* revocation must be warranted. But *how* is a different matter. The question presented here is not whether the government possessed authority to revoke the petitioner's Order of Supervision, but whether it complied with its own regulatory process governing *how* that revocation must occur. On that question, the Court finds that the agency has not done so.

### *a)  Application of Accardi*

The *Accardi* doctrine holds that federal agencies must abide by their own regulations, even when the regulation governs the exercise of an agency's discretion, and failure to do so renders the agency's action unlawful. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Zelaya Diaz v. Rosen*, 986 F.3d 687, 690 (7th Cir. 2021) ("*Accardi* and its progeny teach generally that federal agencies are required to follow their own regulations and some other formally adopted procedures, including those that govern exercises of an agency's discretion.") citing *Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) (discussing scope of *Accardi* in immigration context: "agencies can be held accountable to their own codifications of procedures and policies").

Petitioner does not dispute that ICE possesses discretion under §241.4(I)(2) to revoke an Order of Supervision for any of the reasons identified in the regulation. What petitioner challenges is the government's failure to follow the procedures §241.4(I) requires. When the government elects to release a non-citizen under an OSUP, it places itself within a specific regulatory

6

framework governing re-detention. If it later chooses to revoke that supervision, it must adhere to its own rules.

Any doubt on this point is dispelled by respondents' own Notice of Revocation of Release, which they produced during the December 18 hearing. TRO Tr. (December 18, 2025) at 22 ¶ 24-25. That Notice states, "pursuant to 8 C.F.R. § 241.4," that Ms. Crisan would "promptly be afforded an informal interview" and "an opportunity to respond to reasons for the revocation," including the chance to "submit any evidence" in support of her release. The Notice further provides that, if she were not released following that interview, she would receive notification of a "new review" to occur within approximately three months.

On the present record, the petitioner has made a strong showing that respondents failed to abide by its own regulations. Ms. Crisan was subject to an OSUP. ECF No. 2 at 2. When the government decided to revoke that order, it detained Ms. Crisan without prior notice, without an informal interview, and without an opportunity to respond. ECF No. 1 ¶ 93-97. She was held for days without explanation or documentation, and without any indication of what process—if any—would follow. *Id.* By respondents' own account of the governing process, those procedures had not occurred prior to this Court's ruling on the TRO motion. §241.4(I)(1, 3). TRO Hearing (December 17 and 18, 2025).

Because petitioner has demonstrated a strong likelihood of success in proving that respondents failed to comply with §241.4(I), she has also shown that her arrest and detention by ICE, without notice and the opportunity to respond, is likely unlawful under *Accardi*.

The government's failure to follow its own procedures also implicates due process concerns, as the revocation of conditional liberty without adherence to established rules raises serious questions of fundamental fairness. *Accardi*, 347 U.S. 260, 268 (requiring that the petitioner is "afforded that due process required by the regulations").The petitioner contends that her detention violates due process because the government revoked her long-standing Order of Supervision without complying with the procedures governing that revocation and subsequent detention. ECF No. 1 ¶¶ 93-97. In response, the government contends that the petitioner was already afforded all the processes she was due during the proceedings leading up to the entry of her removal order, and she is not entitled to any further process at this juncture. TRO Hearing. (December 17, 2025) (government asserting that the petitioner has had years of due process, so and so now seeks to expedite removal without jumping through further hoops).

As a threshold matter, the Court concludes that, despite being a noncitizen subject to a removal order, the petitioner nevertheless has due process rights. It is true that Congress may prescribe the rights due to "an alien at the threshold of initial entry." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020). But the Supreme Court has made clear that "once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693 ; *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").

Unlike the petitioner in *Thuraissigiam*, who was detained within twenty-five yards of the border, 591 U.S. at 114, the petitioner has been living in the United States for approximately 18 years. Because the petitioner is within the United States, she is entitled to the full protections of the Due Process Clause.

The government contends that petitioner has already received all the process she is due. That argument conflates the process afforded in connection with the entry of a removal order with the distinct process required to revoke an Order of Supervision and deprive the petitioner of her existing liberty. Due process, however, is not satisfied by the provision of some procedures at some point in a related matter, but by the timing and adequacy of the procedures required in relation to a specific deprivation of liberty. *Simpson v. Brown Cnty.*, 860 F.3d 1001. 1012 (7th Cir. 2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("Due process…calls for such procedural protections as the particular situation demands.")).

The government may not repurpose the process afforded to the petitioner for one determination—the adjudication of removability—to justify a separate deprivation of liberty—the revocation of an Order of Supervision. Each deprivation triggers its own procedural requirements. Where the government has conferred liberty through supervised release, it may not withdraw that liberty without complying with the procedures it has established to govern that decision. *Accardi*, 347 U.S. at 268.

The government's own materials effectively concede that the petitioner is owed due process. During the December 2018, 2025 hearing, the government presented to the Court the "Notice of Revocation of Release," a written document addressed to Ms. Crisan, after her arrest and signed by Erik S. Weiss, the ICE Acting Field Director for Chicago. Section 241.4(I) requires authorization of revocation by the Executive Associate Commissioner of ICE, or by the Chicago Field Office Director provided that circumstances do not permit authorization by the Executive Associate Commissioner; the notice of revocation was signed by the acting Field Office Director, however, without explanation as to why circumstances did not permit either of the designated officials to do so. The document expressly states that the petitioner is to "promptly be afforded an informal interview" at which she will be "given an opportunity to respond to the reasons for the revocation." The Notice further provides that the petitioner "may submit any evidence or information [she] wish[es] to be reviewed in support of [her] release." If the petitioner is not released following that informal interview, she is to "receive notification of a new review, which will occur within appropriately three months of the date of this notice."

The respondents' reluctance to "jump through more hoops" is difficult to square with the requirements of section 241.4(I) and due process. Having determined that the petitioner is likely entitled to due process in connection with the revocation of her supervised release, the Court next considers what process is due.

In determining what process is due, courts must consider "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's countervailing interests." *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). The petitioner's interest in her own liberty is great. *See Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the

liberty that Clause protects."). The risk of erroneous deprivation is likewise significant where supervision without giving the petitioner notice and an opportunity to be heard.

True, the government has an interest in effectuating removal and ensuring that the petitioner does not abscond. But those interests do not outweigh the petitioner's liberty interest in remaining free from detention absent compliance with the procedures governing revocation of supervised release. Requiring the government to follow its own regulations before detaining a previously supervised individual imposes only minimal administrative burden and does not prevent the government from executing a valid removal order after lawful revocation.

The Supreme Court's precedents support this conclusion. The Court has recognized that where liberty is at stake in a civil proceeding, as here, the government's interest must be especially strong.

> [T]his Court has said that government detention violates [the Due Process Clause] unless the detention is ordered in a *criminal* proceeding with adequate procedural protections, or, in certain special and "narrow" nonpunitive "circumstances," where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint."

*Zadvydas*, 533 U.S. at 690 (citation modified).

Here, the government has not identified a special justification that would excuse compliance with the procedures governing revocation of supervision. The mere existence of a final order of removal, standing alone, does not eliminate due process protections or permit detention untethered from the regulatory framework that ICE itself has adopted. Where long-standing release on supervision is withdrawn without clear adherence to those procedures, the resulting detention raises serious due process concerns.

Courts in the Seventh Circuit confronting materially similar challenges to post-final-order detention following long-standing supervised release have reached the same conclusion. *See, e.g. N.A.L.R. v. Bondi*, No. 4:25-CV-00192-SEB-KMB, 2025 WL 2987239 at *2, n. 2 (S.D. Ind. Oct. 23, 2025) (granting habeas relief and releasing petitioner where ICE failed to comply with § 241.4(I) procedures and discussing due process implications); *C.M. v. Maples*, No. 4:25-CV-00198-TWP-KMB, 2025 WL 3091623 at *4 (S.D. Ind. Nov. 5, 2025) (discussing due process implications of ICE failed to follow § 241.4(I) procedures, granting habeas relief and releasing petitioner); *Cedeno-Gonzalez v. Noem*, No. 2:25-CV-00473-JPH-MJD, 2025 WL 2999583 at *2 (S.D. Ind. Oct. 27, 2025) (directing the government to show cause for failure to follow § 241.4(I)) and discussing due process implications).

Accordingly, the petitioner has demonstrated a strong likelihood of success on her claims that the government failed to comply with its own regulations, in violation of both *Accardi* and the petitioner's constitutional right to due process.

### C. Irreparable Harm

Next, Ms. Crisan must demonstrate that she will suffer irreparable harm absent immediate injunctive relief. "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc.*

*v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). An inadequate remedy at law "does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). In practical terms, irreparable harm is harm that cannot be undone through monetary damages and that is likely to occur before the court can resolve the merits.

Ms. Crisan has been confined under conditions that the Court finds deeply troubling. According to petitioner's unrebutted allegations, the petitioner was arrested without notice, shackled, held in filthy, severely overcrowded cells, required to sleep on a concrete floor without a mattress or cot, with a bathroom sink as her only source of drinking water and a camera positioned above the toilet. These conditions are ongoing and cannot be remedied retroactively. Doubtless these experiences will haunt the petitioner for the rest of her life.

Moreover, the harm here is continuing. The petitioner remains detained, and the government has not demonstrated that the procedures required by its own regulations will be promptly afforded. Ms. Crisan has no criminal history and has lived in this country for over a decade, raising children who are United States citizens. If she is ultimately found entitled to relief, no later ruling can restore the time she has already spent in custody. Absent immediate relief, the petitioner will continue to suffer detention under conditions the Court can describe as nothing less than shameful and cruel.

Petitioner's continued detention also threatens irreparable harm to her constitutional interests. All noncitizens are protected by the Due Process Clause of the Constitution, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. It is well established that the deprivation of constitutional rights can constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Ms. Crisan had been living at liberty under an Order of Supervision for years and complying with its conditions before being abruptly taken into custody. Each additional day of detention compounds the harm caused by the alleged unlawful deprivation of that conditional liberty.

For these reasons, the petitioner has made a clear showing that she faces irreparable harm absent temporary injunctive relief.

### D. Balance of Harms and the Public Interest

Once a movant has made the threshold showing of likelihood of success and irreparable harm, the Court must balance the harms to the parties and consider whether the requested relief serves the public interest. *Pritzker*, 973 F.3d 762-63. In conducting this analysis, the Court weighs the harm the movant will suffer absent relief against the harm the non-movant will suffer if relief is granted. *Id.* Where the government is a party, the balance-of-harms and public-interest factors merge. *See Nken v. Holder,* 557 U.S. 418, 435 (2009). The greater the likelihood of success and irreparable harm, the less heavily the balance of harms must weigh in the movant's favor. *Whitaker v. Kenosha Unified Sch. Dist.,* 858 F.3d 1034, 1054 (7th Cir. 2017).

On petitioner's side of the ledger is the continued loss of physical liberty and exposure to conditions the Court has already found deeply concerning. Each additional day of detention compounds that harm, and no later ruling can restore the time already spent in custody. By contrast,

10

the government has not shown that temporarily releasing the petitioner—who has lived for years under an Order of Supervision, complied with its conditions, and who is currently subject to electronic monitoring—would impose a comparable burden.

The government retains the authority to enforce immigration law and to pursue removal in accordance with the law. Granting temporary relief does not prevent respondents from exercising that authority. It merely requires that the government do so while complying with its own regulations. Where the government's interest is continued detention pending future proceedings, and the individual's interest is freedom from allegedly unlawful confinement, the balance of equities favors the individual.

The public interest likewise favors granting relief. The public has a strong interest in the humane and lawful administration of the immigration system—an interest that is not served when the government herds aliens together like animals, making no individual assessment of danger or flight risk, and does not follow its own rules. Ensuring that executive agencies adhere to binding regulations promotes fairness, accountability, and respect for the rule of law.

No party disputes the government's authority to enforce the petitioner's deportation to Romania. What is baffling in this case is the government's choice to detain Ms. Crisan at all. At the time of detention, the government was not prepared to deport her; it conceded that it had not yet obtained travel documentation necessary for removal. Rather than preparing the required documentation and directing Ms. Crisan to report to the airport, the government chose an unnecessary, expensive, and aggressive approach that subjected the petitioner to intolerable conditions of confinement without advancing any legitimate enforcement interest.

Under these circumstances, the public's interest in reasonable, humane and lawful enforcement of the immigration laws substantially outweighs the government's interest in detaining Ms. Crisan in service of a deportation that could have been accomplished without her ever seeing the inside of a cell.

Accordingly, the balance of harms and the public interest strongly support issuance of a temporary restraining order.

### IV.     Remedy

The Court finds that petitioner's immediate release is necessary to restore the status quo *ante litem*. The status quo *ante litem* "is the last uncontested status which preceded the pending controversy." *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958); *see Local 180 of Int'l Union, United Auto. Aircraft & Agr. Workers of Am., AFL-CIO v. J.I. Case Co.*, 281 F.2d 773, 775 n.1 (7th Cir. 1960) ("We have defined the status quo as the last uncontested status which preceded the pending controversy."); *Seagram-Distillers Corp. v. New Cut Rate Liquors*, 221 F.2d 815, 82 (7th Cir. 1955); *Chen v. Noem*, No. 1:25-CV-00733-TWP-MG, 2025 WL 1163653 (S.D. Ind. Apr. 21, 2025) (defining status quo ante litem as the last uncontested status before the pending controversy).

The pending controversy stems from the petitioner's re-detention following the revocation of her Order of Supervision. Prior to that detention, Ms. Crisan had lived in the community for

years under an Order of Supervision and complied with its conditions. That period of supervised liberty constitutes the last uncontested status preceding the events giving rise to this action.

Restoring petitioner to that status—release under the conditions of supervision previously imposed—preserves the status quo *ante litem* while allowing the Court to adjudicate the merits of petitioner's habeas status. Temporary release does not prevent respondents from pursuing removal in accordance with the law; it merely ensures that petitioner is not subject to continued detention while the legality of that detention is resolved. Having considered the four factors governing temporary injunctive relief under *Winter*, the Court finds that (1) petitioner has demonstrated a likelihood of success on the merits of at least one claim challenging the lawfulness of her detention; (2) petitioner faces irreparable harm absent immediate relief; and (3) the balance of harms and the public interest weigh in petitioner's favor. Temporary injunctive relief is therefore warranted, and petitioner's motion for a temporary restraining order is GRANTED.

\* \* \* \* \*

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's Motion for a Temporary Restraining Order is GRANTED;

2. Respondents, and all their officers, agents, servants, employees, and persons acting in concert or participation with them, are ORDERED to immediately release petitioner from custody under the conditions of her prior Order of Supervision;

3. Respondents are PROHIBITED from re-detaining petitioner in connection with her existing removal order during the pendency of this Temporary Restraining Order, absent further order of this Court.

This Temporary Restraining Order Shall remain in effect for fourteen (14) days, unless extended. *See* Fed. R. Civ. P. 65(b)(2).

It is so ordered.

Date: December 22, 2025

John J. Tharp, Jr.
United States District Judge

12