**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALINA CRISAN,<br><br>Petitioner,<br><br>v.<br><br>Samuel OLSON, Markwayne MULLIN, et al.<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 25 C 15252<br><br>Judge John J. Tharp, Jr. |

**MEMORANDUM OPINION AND ORDER**

After Immigration and Customs Enforcement ("ICE") arrested her late last year, Alina Crisan petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and an emergency motion for a temporary restraining order (TRO) seeking immediate release from immigration detention. The Court granted the TRO without reaching the habeas petition, finding that the respondents (collectively, "the government") likely violated the *Accardi* doctrine and procedural due process by neglecting its own binding regulations—8 C.F.R. §§ 241.4 and 241.13. TRO 1. After her release, the government reinstated Ms. Crisan's Order of Supervision (OSUP). Resp't Suppl. Br. 1; Pet'r Suppl. Br. 3.

Now the Court must address the habeas petition. In addition to repeating certain jurisdictional arguments already made, the government argues that the petition is moot. Ms. Crisan maintains that her petition still presents a live controversy and that the Court may enjoin further detention "absent full compliance with statutory, regulatory, and constitutional due process protections." Pet. 29. For the reasons stated below, the Court agrees with Ms. Crisan and grants her habeas petition.

## BACKGROUND

Petitioner Alina Crisan is a 45-year-old Romanian citizen who has lived in the United States continuously since 2007. Pet. ¶ 34. Her family—including her U.S. citizen parents, her three U.S. citizen children, her husband, and her siblings—resides in the United States. TRO Mot. 2. Ms. Crisan has never been convicted of a crime. *Id.*

Ms. Crisan was ordered removed to Romania on January 14, 2011. Pet. ¶ 35. Nevertheless, for nearly 15 continuous years, immigration authorities repeatedly permitted her to remain in the United States. TRO Mot. 2. In 2019, ICE placed Ms. Crisan on an OSUP, authorizing her to live at liberty subject to specific conditions, including periodic check-ins. *Id.* From 2019 through 2025, Ms. Crisan consistently complied with all the conditions of her supervision. *Id.*

On November 10, 2025, Ms. Crisan appeared with counsel for a routine ICE check-in at the Chicago Field Office. *Id.* She was released on an ankle monitor. *Id.* On December 16, 2025, ICE arrested Ms. Crisan. No one gave Ms. Crisan prior notice or an explanation as to why her OSUP was terminated. TRO Mot. 2-3. ICE took Ms. Crisan to the Broadview Processing Center, where she remained for several hours before being transported, in leg shackles and handcuffs, to the Clay County Jail in Brazil, Indiana. TRO Tr. (Dec. 18, 2025) 11:2-8. The next day she was transferred to the Clark County jail, also located in Indiana. Pet'r Status Report. There, according to unrebutted allegations in the habeas petition, the motion for TRO, and the petitioner's testimony, Ms. Crisan was confined in severely overcrowded conditions. *See* Pet. ¶ 52-56; TRO Mot. 10; TRO Tr. (Dec. 18, 2025) 7:17-9:2. She slept on a concrete floor, without a mattress or cot, in a crowded cell where many detainees shared a single toilet. *Id.* She had no privacy, as a camera surveilled Ms. Crisan and the others from above the toilet. *Id.* The only source of drinking water was the bathroom sink. *Id.*

On December 17, 2025, the Court held its first hearing on the TRO motion. During that hearing, the Court asked the government to produce documentation authorizing the revocation of Ms. Crisan's OSUP and subsequent detention. TRO Tr. (Dec. 17, 2025) 16:7-9. At the Court's second hearing on December 18, 2025, the government produced a written Notice of Revocation of Order of Supervision, signed by Acting Chicago Field Office Director Erik S. Weiss on December 16, 2025. TRO Tr. (Dec. 18, 2025) 21:1. The notice states that Ms. Crisan's OSUP has been revoked because of undefined "changed circumstances" in her case, that she would be detained by ICE, and that she would be "expeditiously removed" from the United States pursuant to the outstanding order of removal against her. Resp't Resp. Br., Ex. 2. The notice provides that under 8 C.F.R. §§ 241.4 and 241.13, Ms. Crisan would "promptly be afforded an informal interview" and an opportunity to respond to the revocation decision, including a chance to "submit any evidence or information" in support of her release. *Id.* It further states that if she is not released following this informal interview, she would receive "notification of a new review, which will occur within approximately three months of the date of this notice." *Id.* At the time of her release pursuant to the TRO, Ms. Crisan had not received an interview, an opportunity to respond to the Notice of Revocation, or a chance to submit evidence in support of her release. TRO Tr. (Dec. 18, 2025) 30:10-18.

The Court granted the TRO at the end of the second hearing, ordering Ms. Crisan's release. TRO Tr. (Dec. 18, 2025) 33:25-34:3. The Court found that Ms. Crisan was likely to succeed, at a minimum, in proving that the government denied her procedural due process and violated the *Accardi* doctrine. TRO 7. Following her release, Ms. Crisan did not file a motion for a preliminary injunction, and the TRO expired after 14 days elapsed. TRO 12. The government then proceeded to argue that the habeas petition was moot, and the Court ordered each party to

file a supplemental brief on the issue. Resp't Resp. Br. 3; Dkt. No. 21. As of September 2026, the government has placed Ms. Crisan under a new OSUP. Resp't Suppl. Br. 1, 3; Pet'r Suppl. Br. 3. Pursuant to the OSUP, Ms. Crisan's next mandatory check-in with ICE is on November 10, 2026. Pet'r Suppl. Br. 3.

## DISCUSSION

### I. Jurisdiction

The government takes issue with this Court's jurisdiction on two fronts.[1] It first theorizes that Congress has stripped the federal courts of jurisdiction through legislation. Next, it posits that the Court can no longer provide an effective remedy and that the petition is therefore moot. The Court must ensure that it has subject matter jurisdiction over the dispute at each stage of the proceedings. *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 800 (7th Cir. 2013). A federal court cannot pass judgment on moot questions or abstract propositions. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 914 (7th Cir. 2020). After once again reviewing its jurisdiction, the Court disagrees with the government and finds that it retains jurisdiction.

#### A. 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1231(a)(6)

The government raises similar jurisdictional arguments to those raised during the TRO hearings. Previously, the government argued that Congress stripped this Court of subject matter jurisdiction through 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1252(g). *See* TRO 3-4. At present, the government only advances jurisdiction-stripping arguments pursuant to § 1252(a)(2)(B)(ii), claiming that the Court "essentially construct[ed] a strawman" when it previously addressed this

[1] The Petitioner asserts that this court's jurisdictional rulings in the TRO constitute the "law of the case" and cannot be challenged by the government. Not so. "[A] federal court's ongoing obligation to assure itself of its jurisdiction means that revisiting such matters is almost always on the table." *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022).

section. The government takes issue with the Court's reasoning on two separate grounds. Resp't Resp. Br. 7. First, it argues that the Court ignored important textual distinctions between §§ 1252(a)(2)(B)(i) and (ii). Second, the government claims that the Court failed to address the discretion afforded to it by 8 U.S.C. § 1231(a)(6) regarding supervised release. The Court takes the arguments in turn.

To start, the Court sufficiently addressed the text of §§ 1252(a)(2)(B)(i) and (ii) by citing controlling precedent. In *Kucana v. Holder*, the Supreme Court explained that (B)(i) insulates certain enumerated administrative judgments from judicial review and that (B)(ii) acts as a catchall. 558 U.S. 233, 246-47 (2010). "*Read harmoniously*, both clauses convey that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Id.* at 247. The Supreme Court instructs lower courts to read the clauses "in harmony" with each other, instead of treating each clause like a statutory island, as the government suggests. The Court did not neglect (B)(ii) when it found that "the petitioner does not seek the type of relief listed under 1252(a)(2)(B)(i)." TRO 4. On the contrary, the Court explicitly recognized that (B)(i) limits the catchall in (B)(ii) to "substantive decisions…made by the Executive in the immigration context as a matter of grace." *Id.*; *Kucana*, 558 U.S. at 247-48. Ms. Crisan was extended anything but executive grace. Accordingly, the revocation of her OSUP falls outside § 1252(a)(2)(B)(ii).

Moreover, § 1231(a)(6) does not bar judicial review, either. The government contends that "the statute [] provides the Secretary of Homeland Security with the discretionary power to place any foreign national with an order of removal on OSUP." Resp't Resp. Br. 7. The government cites no caselaw for this proposition but instead claims that the statute's use of the word "may" indicates unreviewable discretion. *Id.* Yet this theory defies the statute's text and structure. By its

own terms, § 1231(a)(6) permits the detention of certain noncitizens "beyond the removal period" set forth in § 1231(a)(1), but states that release is governed by § 1231(a)(3).[2] It does not make supervision discretionary. On the contrary, § 1231(a)(3) states that if removal is not effectuated within the 90-day removal period, the noncitizen "***shall*** be subject to supervision under regulations prescribed by the Attorney General." (emphasis added). Close examination of § 1231(a) raises two important points. First, the Attorney General's discretion as to supervision fits more squarely within § 1231(a)(3). *See Zadvydas v. Davis*, 533 U.S. 678, 695 (2010) (reading § 1231(a)(3) to grant the Attorney General authority over supervision). Second, any discretion afforded to the Attorney General is not unfettered. Section § 1231(a)(3) outlines requirements by which the Attorney General's regulations must abide. *See* 8 U.S.C. § 1231(a)(3)(A)-(D). The government complains that the Court's TRO ruling did not refer to § 1231, but that is because nothing in the text of § 1231 suggests that Congress barred judicial review of ICE's OSUP decisions.

But even if § 1231(a)(6) controlled the analysis as the government suggests, the word "may" does not bar habeas relief. The Supreme Court could not have decided *Zadvydas* if § 1231(a)(6) provided the government with unreviewable discretion. 533 U.S. 678, 699-700 (holding that detention of a noncitizen beyond the statutory removal period requires that the noncitizen's removal be reasonably foreseeable under § 1231(a)(6)). Furthermore, "where a provision precluding review is claimed to bar habeas review, the [Supreme] Court has required a particularly clear statement that such is Congress' intent." *Demore v. Kim*, 538 U.S. 510, 517 (2003); *accord*, *Arreola-Castillo v. United States*, 889 F.3d 378, 390 (7th Cir. 2018) (requiring the

---

[2] Read in its entirety, § 1231(a)(6) reads "an alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)."

government to present a clear statutory statement stripping jurisdiction over habeas petitions). Congress did so in some statutes, including § 1252(a)(2)(B), but not §1231. Section 1231(a)(6) does not provide a clear statement barring habeas petitions but only permits detaining certain noncitizens "beyond the removal period." The statute does not address habeas relief pursuant to 28 U.S.C. § 2241, supervision, or the revocation of OSUPs. Thus, even if § 1231(a)(6) controlled the analysis, it lacks the type of clear statement required to bar judicial review.

**B. Mootness**

The government acknowledges that "release from custody does not automatically render a habeas petition moot," Resp. at 3,[3] but also claims that Ms. Crisan "has received all of the relief requested in her petition." Resp't Suppl. Br. 1. Yet a closer look at Ms. Crisan's petition reveals that she has not received all the relief she requested. In her prayer for relief, Ms. Crisan requested "that the court enjoin Respondents from re-detaining [her] absent full compliance with statutory, regulatory, and constitutional due process protections." Pet. 29. The TRO did not grant this request because it only prohibited the government from "re-detaining petitioner in connection with her existing removal order" for 14 days. TRO 12. And, as already mentioned, the TRO expired months ago. Ms. Crisan continues to seek this injunctive relief in her supplemental briefing and has never

[3] Despite this acknowledgment, the government claims that release from detention "is still the *sine qua non* of habeas." Resp't Resp. Br. 3. Not to be overly pedantic, but that term translates from Latin to "[a]n indispensable condition or thing; something on which something else necessarily depends." Sine Qua Non, Black's Law Dictionary (12th ed. 2024). If custody is an "indispensable condition" of a live habeas controversy, then Ms. Crisan's release would moot the petition. Yet the government already concedes that release from custody does not automatically moot a habeas petition, so this reasoning creates no mootness issue. Furthermore, Ms. Crisan only needed to be in custody when she filed her habeas petition for statutory purposes. *See* 28 U.S.C. § 2241(c) (requiring the petitioner to be in custody); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (interpreting a related provision in 28 U.S.C. § 2254 to require a petitioner be in custody only at the time of filing).

wavered from this position. Pet'r Suppl. Br. 4. In short, Ms. Crisan has not yet received all the relief sought in her petition.

Since the underlying events of this habeas petition, recent Seventh Circuit precedent has illustrated why this case is not moot. In *Cirrus Rojas v. Olson*, the court considered whether a noncitizen's release from custody mooted their habeas petition. 183 F.4th 909, 914 (7th Cir. 2026). In finding that the petition was still live, the Court noted that the case was not moot "[s]o long as a court can provide even a partial remedy" and that "nothing, absent our intervention, stops the government from" re-detaining the petitioner. *Id.* at 916 (*Calderon v. Moore*, 518 U.S. 149, 150 (1996) (quotations omitted). *Cirrus Rojas* and the present case share important similarities. The court reasoned that Cirrus Rojas's release was "at most temporary" and appeared likely to end "at any time," after DHS vowed to detain him once more. *Id.* at 917. In the present case, the government has not explicitly stated that they will detain Ms. Crisan again, but they maintain—even after the TRO—that her arrest, detention, and OSUP revocation were lawful. Resp't Resp. Br. 2-3. Meanwhile, Ms. Crisan remains subject to the same removal order and the TRO no longer provides any protection. The OSUP offers only cold comfort, considering that the government previously detained Ms. Crisan before revoking her last OSUP. *Id.*, Ex. 1 ¶ 6 (arrest occurred before 1 p.m. on Dec. 16, 2025); *Id.*, Ex. 2 (OSUP rescinded at roughly 4:45 p.m. the same day). Given the government's demonstrated interest in removing Ms. Crisan from the United States, Ms. Crisan's re-detention risk looms large.

This impending re-detention risk explains why the government's contentions about a lack of collateral consequences do not bear scrutiny. The government relies heavily on *Spencer v. Kemna*, where the Supreme Court affirmed that a habeas petition challenging the petitioner's revocation of parole was moot. 523 U.S. at 6. By the time of judicial review, the petitioner had

already finished serving his sentence. *Id.* Consequently, the Supreme Court addressed the question of whether potential collateral consequences of a parole revocation conviction can save a case from mootness, concluding that they did not.[4] *Spencer* is of no help to the government here, however, because the Supreme Court only turned to collateral consequences ***after*** noting that "the reincarceration that [petitioner] incurred as a result of [the revocation of parole] is now over, and cannot be undone." *Id.* Said another way, the petitioner's detention could not recur because it followed from his revocation of parole. Here, the opposite is true. Ms. Crisan faces re-detention risk based on the same legal theory examined in the TRO. The government does not concede that its previous detention of Ms. Crisan—without notice or an opportunity to be heard regarding her OSUP's revocation—was unlawful. Instead, the government argues that this Court lacks subject matter jurisdiction over this dispute entirely. Resp't Resp. Br. 6-7. Ms. Crisan remains subject to an order of removal, and the government sees no issue with her prior detention.

Put differently, the present facts demonstrate adverse legal interests surrounding a "concrete and continuing injury." *Spencer*, 523 U.S. at 7. The Court does not need to analyze the collateral consequences doctrine, which only applies when the litigants no longer maintain a relationship outside of the courthouse. *See Diaz v. Duckworth*, 143 F.3d 345, 346 (7th Cir. 1998) (considering the applicability of collateral consequences after petitioner's deportation); *Spencer*, 523 U.S. at 7 (considering collateral consequences after the petitioner finished their sentence

[4] The government suggests that only continued detention or a lingering "order or restriction" could satisfy a concrete and continuing injury. Resp't Resp. Br. 4. To support this contention, the government cites a single district court case in which "the court ha[d] received no communications from the petitioner since he filed the petition," and accordingly found the petition moot. *Candelaria v. Schmidt*, 2017 U.S. Dist. LEXIS 69898, *5 (2017). Ironically, Judge Pepper recognized in *Candelaria* that an OSUP could prevent a case from becoming moot. *Id.* (citing *Alvarez v. Holder*, 454 F. App'x 769, 772-73 (11th Cir. 2011) (finding that the conditions imposed pursuant to an OSUP were sufficient collateral consequences to keep a habeas petition live)).

resulting from the challenged revocation of parole).[5] By contrast, Ms. Crisan must stay in contact with ICE for as long as she resides in the United States pursuant to the removal order. If *Spencer* "tries to bring the law of habeas corpus into conformity with a general 'hardening' of standing requirements," *Diaz*, 143 F.3d at 347, then it logically follows that a non-speculative future risk of re-detention justifies a live controversy. *Cirrus Rojas*, 183 F.4th at 917 (habeas petition still live based on re-detention risk); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) (finding that a non-speculative, substantial future risk may establish injury in fact for standing).[6] The government seems to mistakenly believe that a live controversy requires collateral consequences, when establishing such consequences is merely one sufficient way of demonstrating a live controversy.

The same reasoning is baked into the voluntary cessation exception to mootness, which provides another reason why Ms. Crisan's case is not moot. The voluntary cessation exception recognizes that the impending risk of the same injurious conduct recurring stops a case from becoming moot. "A defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528

[5] The lack of an ongoing relationship demonstrates why collateral consequences must entail some "statutory disabilit[y] such as loss of the right to vote or the right to own a gun" to prevent a case from mooting. *Diaz*, 143 F.3d at 346. The litigants' out-of-court relationship ceases to exist, and so the petitioner must establish some residual impact suffered. The re-detention risk is more of a direct consequence than a collateral one, which explains in part why the Court does not adopt the reasoning of *Alvarez*. *See* 454 F. App'x at 772-73 (finding an OSUP's conditions sufficient collateral consequences). What is more, an OSUP does not create the type of statutory disability that *Spencer* and *Diaz* require.

[6] As the Supreme Court has explained, the doctrines of standing and mootness share similarities. However, "it is the doctrine of mootness, not standing, that addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022) (citing *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (cleaned up)).

U.S. 167, 174 (2000).[7] Mootness exists only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 170. The burden is heavy and rests with the party asserting mootness. *Id.* Despite issuing a new OSUP, the government has not disavowed the lack of process used to revoke Ms. Crisan's previous supervision. *See* Resp't Resp. Br. 1, 4. Nor have they provided sworn assurances that Ms. Crisan will not be re-detained under the same revocation theory. *Id.*[8]

In this respect, *Los Angeles v. Lyons* provides a useful comparison with Ms. Crisan's case. 461 U.S. 95, 109 (1983). Mr. Lyons alleged that Los Angeles police used an illegal chokehold on him during a traffic stop, but this did not "make a reasonable showing that he [would] again be subjected to the alleged illegality." *Id.* Before the Supreme Court decided the case, the Los Angeles Chief of Police banned the use of chokeholds while the Board of Police Commissioners instituted a related 6-month moratorium on the practice. *Id.* at 100. In Ms. Crisan's case, the government posits no changed policies or circumstances that ensure she will not be subjected to the same actions again. She must continue to maintain a relationship with ICE as part of the new OSUP, whereas Mr. Lyons had no continuing contact with the police. *Id.* at 105-106. At some point, the government will likely revoke her OSUP to effectuate the removal order, yet they have not

[7] One might not consider the current situation a "voluntary cessation" because the Court ordered the government to release Ms. Crisan from custody "under the conditions of her prior Order of Supervision." TRO 12. The Court did not order the government to issue an entirely new OSUP, and, even if construed this way, the TRO no longer has legal effect. In this respect, Ms. Crisan's supervision today is voluntary.

[8] This case is distinguishable from *Djadju v. Vega*, where the Eleventh Circuit held that the voluntary cessation doctrine could not save the petitioner's habeas motion. 32 F.4th 1102, 1109 (11th Cir. 2022). Unlike in the present case, the government in *Djadju* "conceded at oral argument that before it could redetain Djadju, it would need to overcome various administrative hurdles -- showing, for example, that Djadju violated the order of supervision, or that he would likely be removed in the reasonably foreseeable future." *Id.* As to Ms. Crisan, the government has never made similar concessions.

disclaimed using the same methods despite ample opportunity to do so in their briefs. Resp't Resp. Br. 1, 4; Resp't Suppl. Br. 1. It does not take a speculative leap to recognize that Ms. Crisan faces the risk of parallel events unfolding. Accordingly, the voluntary cessation exception to mootness applies.[9]

Finally, the Court notes that temporary relief does not generally moot a habeas petition. In *Nielsen v. Preap*, 586 U.S. 392, 403 (2019), petitioners had been released pursuant to a preliminary injunction while their § 2241 habeas corpus class action remained pending. *Id.* The Supreme Court held their claims were not moot, explaining that "[u]nless that preliminary injunction was made permanent and was not disturbed on appeal, these individuals faced the threat of re-arrest and mandatory detention." *Id.* Applying the same logic to this case, the TRO was never converted into a preliminary or permanent injunction. Therefore, Ms. Crisan faces the same threat of arrest, detention, and revocation of her OSUP without process of law. While the TRO required the government to release Ms. Crisan, it did not determine whether ICE lawfully revoked her OSUP. The Court held that the government likely violated the law, but the merits remain unresolved.[10]

---

[9] In many recent habeas immigration cases, district courts have ruled that voluntary cessation principles may preserve a habeas petition from becoming moot. *See, e.g.*, *Vardanyan v. Noem*, No. 5:26-CV-00423-MRA-RAO, 2026 WL 383341, at *2 (C.D. Cal. Feb. 11, 2026); *Min v. Santacruz*, No. 2:25-CV-10971-MEMF-AS, 2025 WL 3764071, at *4 (C.D. Cal. Dec. 23, 2025); *M.V.F. v. Santacruz*, No. 2:25-CV-11700-MEMF-E, 2026 WL 127740, at *3 (C.D. Cal. Jan. 6, 2026).

[10] The emerging consensus among district courts is that release pursuant to a TRO does not moot a pending habeas petition. *Iza by Iza v. Larocco*, No. 2:25-CV-6915 (NJC), 2026 WL 31378 *n. 6 (E.D.N.Y. Jan. 5, 2026); *Vardanyan*, 2026 WL at *1; *Min v. Santacruz*, 2025 WL at *2; *M.V.F. v. Santacruz*, 2026 WL at *2; *Esmail v. Noem*, No. 2:25-CV-08325-WLH-RAO, 2025 WL 3030589 *n.5 (C.D. Cal. Sep. 26, 2025); *Ortiz Martinez v. Wamsley*, No. 2:25-cv-01822, 2025 WL 2899116, at *3 (W.D. Wash. Oct. 10, 2025); *Cruz v. Lyons*, No. 5:25-CV-02879, 2025 WL 3443146, at *2 (C.D. Cal. Dec. 1, 2025); *Carlos v. Noem*, No. 2:25-CV-01900, 2025 WL 2998184, at *4 (D. Nev. Oct. 24, 2025); *J-C-R-M v. Wamsley*, No. 3:25-cv-990, 2025 WL 3527108, at *4 (D. Or. Dec. 9, 2025).

In summary, Ms. Crisan's habeas petition is not moot. The temporary restraining order releasing her from detention was just that: temporary. And although the government has issued a new OSUP, this action alone does not carry the heavy burden of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc.*, 528 U.S. at 170. Indeed, the government provides no assurances about their future course of action as to Ms. Crisan. At no point in its briefings has the government vowed to follow its own regulations if it were to revoke her OSUP once more. *See* Resp't Resp. Br.; Resp't Suppl. Br. Ms. Crisan's habeas petition requested an injunction "enjoin[ing] Respondents from re-detaining Petitioner absent full compliance with statutory, regulatory, and constitutional due process protections." Pet. 29. The TRO and OSUP do not wipe the petition clean of this request. If granting even a partial remedy stops a case from becoming moot, then this Court must continue to the merits. Adverse, litigable interests are still at play.

## II. The Merits

A district court may grant a writ of habeas corpus when a petitioner demonstrates that they are, or were at the time of petitioning, "in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2241(c)(3); *Spencer*, 523 U.S. at 7 (requiring that the petitioner be in custody at the time of filing). Equitable principles traditionally govern the substantive law of habeas corpus. *Holland v. Florida*, 560 U.S. 631, 646 (2010). Because a writ of habeas corpus provides an "adaptable remedy," a court may tailor the relief based on the unique circumstances before it. *Boumediene v. Bush*, 553 U.S. 723, 779 (2008).

In granting the TRO, the Court found that Ms. Crisan was likely to succeed on the merits with respect to at least two legal theories: one stemming from the *Accardi* doctrine and the other from the Due Process Clause of the Fifth Amendment. TRO 9. The Court once again focuses on

these two theories because they provide a sufficient basis for the relief now sought. For the reasons stated below, the Court finds that the government violated the law when it revoked Ms. Crisan's OSUP without providing constitutionally adequate process.

### A. *Accardi*

The *Accardi* doctrine holds that federal agencies must abide by their own regulations, even when the regulation governs the exercise of an agency's discretion, and failure to do so renders the agency's action unlawful. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Zelaya Diaz v. Rosen*, 986 F.3d 687, 690 (7th Cir. 2021) ("*Accardi* and its progeny teach generally that federal agencies are required to follow their own regulations and some other formally adopted procedures, including those that govern exercises of an agency's discretion.") (citing *Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018) (discussing *Accardi*'s scope in the context of immigration: "agencies can be held accountable to their own codifications of procedures and policies")).

Ms. Crisan does not dispute that ICE possesses discretion under §241.4(l)(2) to revoke an OSUP for any of the reasons identified in the regulation. What Ms. Crisan challenges is the government's failure to follow the procedures required by §241.4(l). When the government elects to release a non-citizen under an OSUP, it places itself within a specific regulatory framework governing re-detention. If it later chooses to revoke that supervision, it must adhere to its own rules.

As the court observed in its TRO ruling, any doubt on this point is dispelled by the government's own Notice of Revocation of Release, which they produced during the December 18 hearing. TRO Tr. (Dec. 18, 2025) 30:8-9. That Notice states, "pursuant to 8 C.F.R. § 241.4 / 8 C.F.R. § 241.13," that Ms. Crisan would "promptly be afforded an informal interview" and "an

opportunity to respond to reasons for the revocation," including the chance to "submit any evidence" in support of her release. Resp't Resp. Br., Ex 2. The Notice further provides that, if she were not released following that interview, she would receive notification of a "new review" to occur within approximately three months. *Id.*

The record makes clear that the government never provided Ms. Crisan with this process. When the government decided to revoke Ms. Crisan's OSUP, it detained Ms. Crisan without prior notice, without an informal interview, and without an opportunity to respond. Pet. ¶ 93-97. In fact, the government revoked her OSUP ***after*** detaining her. Resp't Resp. Br., Ex. 1 ¶ 6 (arrest occurred before 1 p.m. on Dec. 16, 2025); *Id.*, Ex. 2 (OSUP rescinded at roughly 4:45 p.m. the same day). She was held for days without explanation or documentation, and without any indication of what process, if any, would follow. *Id.* By the government's own account of the events, the procedures required by regulation never occurred. TRO Hearings (Dec. 17 and 18, 2025); Resp't Suppl. Br. 1. Ms. Crisan has shown that ICE neglected both § 241.4 and § 241.13 by affording her no meaningful process.[11] Therefore, ICE's actions were unlawful under *Accardi*.

The government raises a few new objections since this Court issued the TRO. In its response brief, the government argues that "Ms. Crisan's [Administrative Procedures Act] and Accardi claims . . . are not even viable as a matter of law." Resp't Resp. Br. 8. The government

---

[11] Regulation 241.4(l)(3) reads in relevant part: "Upon revocation, the alien will be notified of the reasons for revocation of his or her release. The Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification. The alien may submit any evidence or information that he or she believes shows there is no significant likelihood he or she be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision. The revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." Regulation 241.13(i)(3) requires a similar process upon revocation, but only after "the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. §§ 241.13(i)(2), (3).

cites *Trump v. J.G.G.* for this proposition. 604 U.S. 670 (2025). In that case, the Supreme Court held that petitioning for habeas corpus is the proper avenue for challenging executive detention pursuant to the Alien Enemies Act. *Id.* at 672. By the time the case reached the Supreme Court, the detainees had dismissed their habeas petitions and instead relied exclusively on claims grounded in the APA. *Id.* at 617. *J.G.G.* is inapposite for at least two reasons. First, the Alien Enemies Act plays no role in this case. Second, Ms. Crisan raises the APA and *Accardi* doctrine as part of her live habeas petition. In this respect, the government is overlooking the text of 28 U.S.C. § 2241(c)(3), which states that the writ of habeas corpus shall not extend to a petitioner unless "[sh]e is in custody in violation of the Constitution ***or laws*** or treaties of the United States." (emphasis added).

For Ms. Crisan to successfully petition this Court, she must point to a specific law that the government has violated. The APA, the *Accardi* doctrine, and 8 C.F.R. § 241.4 fill this requirement. The detainees in *J.G.G.* did not bring a habeas petition before the Supreme Court; they only brought claims based on the APA. By contrast, Ms. Crisan brings a habeas petition under § 2241 supported by administrative law violations. The government continues to argue that the availability of habeas relief effectively displaces both APA and *Accardi* claims. Resp't Resp. Br. 9. In doing so, the government inappropriately conflates the APA and the *Accardi* doctrine. Even if it were correct that Ms. Crisan is advancing separate legal theories under the APA from the relief sought pursuant to § 2241, then only the APA claims could be challenged. The *Accardi* doctrine is independent of the APA. The Supreme Court did not rely on, or even mention, the APA in *Accardi*. *See Accardi*, 347 U.S. at 261-68. In fact, claiming that habeas relief displaces *Accardi* is a *non sequitur*, because *Accardi* itself reviewed a habeas action. *Id.* at 261.

The doctrine's relevance here stems from § 241.4(l) and § 241.13, not the APA.[12] To reiterate, *Accardi* stands for the basic proposition that government agencies cannot ignore their own regulations. *Zelaya Diaz*, 986 F.3d at 690. Regulations are binding laws. When the government revoked Ms. Crisan's OSUP and detained her without complying with § 241.4(l), ICE violated the laws of the United States pursuant to 28 U.S.C. § 2241(c)(3). A violation of regulations designed to protect due process, like § 241.4 and § 241.13, may entitle a petitioner to habeas relief. *Accardi*, 347 U.S. at 267-68 (respondent neglected regulations that afforded petitioner the right to a fair hearing). This is precisely Ms. Crisan's case and justifies the Court in providing her with further equitable relief.

**B. Procedural Due Process**

The government's failure to follow its own procedures also raises due process concerns, as the revocation of conditional liberty without adherence to established rules raises serious questions of fundamental fairness. *Accardi*, 347 U.S. 260, 268 (requiring that the petitioner is "afforded that due process required by the regulations"). Ms. Crisan contends that her detention violated due process because the government revoked her long-standing OSUP without complying with the procedures governing revocation and detention. Pet. ¶¶ 93-97. At the TRO hearing, the government conflated the process afforded to Ms. Crisan in connection with the entry of her removal order with the distinct process required to deprive her of the liberty provided by her OSUP. TRO Hearing. (Dec. 17, 2025) (government asserting that the petitioner has had years of due process).

---

[12] The out-of-circuit cases that the government relies on do not grapple with the *Accardi* doctrine. Instead, they contemplate whether the APA can act as a substitute for the writ of habeas corpus. *See Raspoutny v. Decker*, 708 F. Supp. 3d 371, 381 (S.D.N.Y. 2023) (never considering the *Accardi* doctrine); *Lucas v. Fed. Bureau of Prisons*, No. 17 CV 1184 (VB), 2018 WL 3038496, at *2 (S.D.N.Y. June 19, 2018) (same); *Stern v. Fed. Bureau of Prisons*, 601 F. Supp. 2d 303, 306 (D.D.C. 2009) (same).

Due process, however, is not satisfied by the provision of some procedures at some point in a related matter, but by the timing and adequacy of the procedures required in relation to a specific deprivation of liberty. *Simpson v. Brown Cnty.*, 860 F.3d 1001, 1012 (7th Cir. 2017) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("Due process…calls for such procedural protections as the particular situation demands.").

The government now contends that *Mathews* is not appropriate in this context but cites only non-persuasive precedent. Resp't Resp. Br. 9. The government principally relies on two cases—*Parra v. Perryman*, 172 F.3d 954 (7th Cir. 1999) and *Demore v. Kim*, 538 U.S. 510 (2010)—which are both governed by 8 U.S.C. § 1226(c). This statutory subsection requires that the Attorney General detain a noncitizen who is deportable because they have committed a felony. 8 U.S.C. § 1226(c); *Demore*, 172 F.3d at 513 (briefly describing the structure of § 1226).[13] Ms. Crisan has not committed any offense and thus falls squarely outside the bounds of § 1226(c). Yet according to the government, "the Supreme Court has already held that detention of a foreign national during the pendency of removal proceedings (or to execute a removal order) satisfies due process." Resp't Resp. Br. 10. The inserted phrase "or to execute a removal order" performs some heavy lifting because the cases themselves never address the execution of a removal order. In both *Demore* and *Parra*, a noncitizen challenged their mandatory detention pursuant to § 1226(c) while awaiting the issuance of their final removal order. *Parra*, 172 F.3d at 956 ("The question at hand therefore is where [the detainee] passes the time while waiting for the order to become final.");

[13] Section 1226(c) specifically targets those "deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence (*sic*) to a term of imprisonment of at least 1 year." Section 1227(a)(2)(A)(i) pertains to deporting noncitizens who have committed "crimes of moral turpitude." The government does not allege that Ms. Crisan has committed a crime, let alone one of moral turpitude.

*Demore*, 538 U.S. at 513 (holding that Congress "may require that persons such as respondent be detained for the brief period necessary for their removal proceedings.").

*Demore* and *Parra* provide no instruction here, where the government has arrested a noncitizen to effectuate a nearly two-decade old removal order while she was still subject to an OSUP. As the Court noted in the TRO, the mere existence of a final order of removal, standing alone, does not eliminate due process protections or permit detention untethered from the regulatory framework that ICE itself has adopted. TRO 9; *Zadvydas*, 533 U.S. at 693 ("once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) ("[A]liens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."). The government points out that Congress regularly adopts immigration laws that would likely run afoul of the law if applied to citizens instead of noncitizens. Resp't Resp. Br. 10. That may be true, but Congress has not done so in Ms. Crisan's case.

The upshot is that the Court sees no reason why *Mathews* should not govern the petition. The Due Process Clause applies to noncitizens and citizens alike,[14] and so the Court must apply *Mathews* to determine what process is due to Ms. Crisan. In determining what process is due, courts must consider "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's

[14] The Court has already noted that the Due Process Clause applies to noncitizens like Ms. Crisan and adopts that same reasoning here. TRO 8. The Seventh Circuit recently affirmed this principle through similar analysis. *Cirrus Rojas*, 183 F.4th at 930 n.7 (rejecting the entry-fiction doctrine); TRO 7-8 (same).

countervailing interests." *Simpson*, 860 F.3d at 1006 (citing *Mathews*, 424 U.S. at 335). For the sake of judicial economy, the Court adopts its reasoning from the TRO so that it may focus instead on the arguments now raised by the government. *See* TRO 7-9 (performing analysis under *Matthews*). At their core, these new arguments insist that the Court should weigh the factors differently while doing little to persuade the Court.

Pertaining to the first factor, Ms. Crisan's private interest in her continued liberty remains high. The government borrows from *Para*, arguing that her liberty interest should carry little weight because she is "not entitled to remain in this country." *Parra*, 172 F.3d at 958. But in *Para*, the "criminal alien" petitioner was subject to mandatory detention, not an OSUP. Ms. Crisan has a strong interest in avoiding detention without at least some process of law, especially given that she has lived peacefully and ***lawfully***—given that she has abided by her OSUP—in the United States for nearly two decades. When paired with her government issued OSUP—which entitles her to say in the country while it remains in effect—Ms. Crisan's liberty interest seems vastly greater than a noncitizen subject to mandatory detention because of a felony. *Id.* (holding that "a ***criminal alien*** who insists on postponing the inevitable has no constitutional right to remain at large" while awaiting a removal order) (emphasis added). Further, the risk of erroneous deprivation is significant where supervision is revoked without giving the petitioner notice and an opportunity to be heard. The Court does not need to consider "additional procedural safeguards" when the government is bound to follow regulations that offer these protections. 8 C.F.R. §§ 241.4, 241.13. Little more needs to be said about the second factor.

As to the third factor, the Court has already acknowledged—and Ms. Crisan does not contest—that the government has a legitimate interest in effectuating removal. TRO 9. But those interests do not outweigh Ms. Crisan's liberty interest in remaining free from detention absent

compliance with the procedures governing revocation of an OSUP. Requiring the government to follow its own regulations before detaining a supervised individual imposes only minimal administrative burden and does not prevent the government from executing a valid removal order after lawful revocation. *See Zadvydas*, 533 U.S. at 690 (holding that detention typically violates the Due Process Clause outside of criminal proceedings and narrow, nonpunitive circumstances justified by special circumstances). No special circumstances justify detaining Ms. Crisan. TRO 9. The government even acknowledges that Ms. Crisan is similarly situated to "thousands of other foreign nationals" subject to removal orders. Resp't Resp. Br. 4. And as the Court noted in the TRO, while the government may have substantial discretion in deciding whether to revoke an OSUP, how that revocation takes place is a different matter entirely. TRO 6.

The Court has already labored through many of the same arguments the government now raises, so it does not need to dive into greater detail. The United States violated Ms. Crisan's procedural due process rights when it revoked her OSUP without any notice or opportunity to be heard. Indeed, the "Notice of Revocation of Release" acknowledges the regulatory process that Ms. Crisan was entitled to. TRO 8. The government argues that an administrative violation alone cannot justify habeas relief because "it is a mere administrative regulation, not required as the result of the Constitution." Resp't Resp. Br. 13. Once again, the opposite is true. Regulations like §§ 241.13(i)(3) and 241.4(l) exist to ensure that administrative agencies comply with the Due Process Clause. The essence of due process is receiving notice and an opportunity to be heard when government action threatens an individual with the loss of life, liberty, or property. *Mathews*, 424 U.S. at 348. The regulations at issue here ensure that people like Ms. Crisan receive these protections. By ignoring them, the government violated Ms. Crisan's Fifth Amendment right to procedural due process.

* * *

Pursuant to 28 U.S.C. § 2241, the Court grants Ms. Crisan's habeas petition. The remedy entered is a simple one: an order stating that the government must follow its own laws. Therefore, if the government seeks to revoke Ms. Crisan's OSUP once again, it must do so in accordance with the Fifth Amendment, 8 U.S.C. § 1231, 8 C.F.R. §§ 241.4 and 241.13, and any other laws made applicable by the specific circumstances at the time of revocation.

Date: November 9, 2026

John J. Tharp, Jr.
United States District Judge